ESTATE OF WILBUR B. RUTHRAUFF, DECEASED, BY ABBIE H. B. RUTH-RAUFF AND FRANK BOURNE RUTHRAUFF, AS EXECUTORS UNDER THE LAST WILL AND TESTAMENT OF WILBUR B. RUTHRAUFF, DECEASED, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 8194. Promulgated September 25, 1947.

---

*Neil P. Cullom, Esq.*, for the petitioners.
*Francis X. Gallagher, Esq.*, for the respondent.

OPINION.

KERN, *Judge*: Respondent contends that the proceeds of the policies of life insurance transferred by decedent to the trusts created on

August 14 and August 26, 1935, are includible in decedent's estate as transfers in contemplation of death and by reason of the decedent's expressed retention of a possibility of reverter.

With regard to the first contention, we do not believe that the facts shown by the record require us to conclude, as urged by respondent, that the transfers were testamentary in nature and, therefore, in contemplation of death. It is uncontroverted that the decedent was in good health at the time of the transfers, and the parties have stipulated that he did not make the transfers and assignments by reason of any apprehension that death was imminent or close at hand. The record shows that the decedent was very conscious of the vicissitudes of life and was fearful that during his life some event or series of events might occur, as did in his father's case, which would wipe out the fund which he had created to take care of his family's needs. In making the transfers decedent was concerned with the things of life rather than of death. He sought to protect the fund to be realized from his life insurance policies from encroachment or dissipation by reason of his own actions or misfortune during his lifetime. Furthermore, the life tenant was given a substantial immediate benefit during his lifetime, namely, the right to receive all payments for disability of the donor in the event of his complete disability as defined in some of the insurance policies; this right assured her of substantial income if he should become so disabled as to be unable to support her. Under the August 14, 1935, trust, the individual trustee, who was one of the remaindermen, was also given the right after the life tenant's death, even though the donor still survived, to cause the surrender of any policy for its cash value; in the event of such surrender the proceeds were distributable to the persons entitled to take as remaindermen at that time.

In urging that the transfers here were in contemplation of death, respondent relies particularly upon the recent cases of *Davidson* v. *Commissioner*, 158 Fed. (2d) 239, and *Vanderlip* v. *Commissioner*, 155 Fed. (2d) 152; certiorari denied, 329 U. S. 728. We are not persuaded by these authorities to hold as respondent requests we do.

In the *Davidson* case the decedent acquired policies of insurance on her life in order to provide for the payment of certain sums upon her death in accordance with a request of her deceased husband and to provide a fund for the payment of death taxes and costs of administration of her estate upon death. She subsequently transferred these policies irrevocably to a trust which provided for life payments out of income and principal to certain beneficiaries. The decedent executed a new will on the same day as she executed the trust agreement, and by a subsequent codicil to the will she bequeathed her residuary estate to the trustee, to be held and administered pursuant to the terms of the trust. The court found that the will and trust had

the common objective of financial provision for the beneficiaries after the deccedent's death, and that "it was not unreasonable to conclude from all the facts and circumstances in the case that they both sprang from the same motive, namely, a disposition, in the nature of a testamentary disposition, of her estate."

In the *Vanderlip* case the sole motive for the transfer of certain policies of insurance in trust was the desire of the transferor to avoid estate taxes thereon, which motive is not present in the case at bar. The transferor's motive in the cited case was associated with death and not with life. Judge Learned Hand, in his opinion in the *Vanderlip* case, recognized that transfers such as those here involved might not be in contemplation of death, saying:

* * * When the property produces no income, living the donor, or when it does, and he reserves it to himself, it may be open to question whether any motive can exclude it from his estate. * * * Situations may be put in which it might be plausibly argued that motive would be relevant: for example, the donor may wish to protect the property against the hazards of his business * * *. Whether these would affect the result, we leave open because here the donor only desired to avoid estate taxes, and we cannot see how that can be classed among those motives which will on any theory take a gift out of the section. * * *

The recent opinions of this Court in *Estate of Arthur D. Cronin*, 7 T. C. 1403, and *Estate of Paul Garrett*, 8 T. C. 492, do not require a conclusion other than the one which we have reached.

In the *Cronin* case the transfers of insurance were grouped in time with the execution of the decedent's will, and within a space of five months the decedent established a plan for the devolution of his entire estate. The value of the insurance policies transferred was more than five times as great as the net amount returned as subject to the basic estate tax. Although the assignee of the policies was given various rights susceptible of exercise, consumption, and enjoyment during the insured's life, the parties intended that these rights be exercised only for the purpose of protecting and enhancing the real subject of the transfer, namely, the right to receive the proceeds upon the insured's death. Here we have no such comparable evidence indicating that the transfers of the insurance policies were but part of a plan for the devolution of the decedent's entire estate.

*Estate of Paul Garrett, supra,* involved a transfer of life insurance policies and income-producing securities to a trust. The income from the securities was to be used in part for the maintenance of the policies. Unlike the situation here before us, the trustee in the *Garrett* case had an express duty of paying the premiums on the policies during the life of the grantor in so far as was necessary to keep the policies in full force, the payments to be made out of the net income of the trust. The care which the decedent took to preserve intact an estate which would come to fruition upon his death compelled the conclusion

that as to the life insurance policies, and as to that part of the securities the income of which was necessary to keep the policies in force, the decedent's motive was dominantly testamentary and the transfer was in contemplation of death. It does not appear that *Garrett* was motivated by any consideration associated with life, such as the decedent in the present case had in mind in making his transfers.

It is true, as pointed out in the *Cronin* case, that life insurance policies are inherently testamentary in nature, but this fact alone does not create an inference that a *transfer* of rights in such policies, as distinguished from the *creation* of such rights, is in contemplation of death. Where the transfer is primarily motivated, as here, by the decedent's preoccupation with circumstances connected with his life, the transaction does not come within the scope of the contemplation of death provisions, even though the rights transferred were originally created because the assured realized that at some indefinite time in the future he would die. See *Estate of Paul Garrett, supra; Thomas C. Boswell et al., Executors*, 37 B. T. A. 970; and *Chemical Bank & Trust Co. et al., Executors*, 37 B. T. A. 535. Where the transfer is made for the purpose of protecting the transferor's family from the hazards of his business or business activities, the motive is associated with life and the same rule applies. *Colorado National Bank* v. *Commissioner*, 305 U. S. 23; and *Allan S. Lehman et al., Executors*, 39 B. T. A. 17; affirmed on another point, 109 Fed. (2d) 99. See also *Brown* v. *Commissioner*, 74 Fed. (2d) 281, and *Wishard* v. *United States*, 143 Fed. (2d) 704.

Respondent's second contention is that the proceeds of these insurance policies are includible in the decedent's estate by reason of the decedent's expressed retention of a possibility of reverter. Respondent has failed to indicate explicitly whether he predicates his contention on subsection (c) or subsection (g) of section 811, Internal Revenue Code. However, since the respondent, in his determination of deficiency, has included the policies of insurance in the decedent's estate only to the extent which the portion of premium payments made by the decedent on the policies bore to the total premiums paid, and since respondent has purportedly allowed the statutory insurance exemption in his computation of deficiency, it appears that respondent's position is primarily based upon section 811 (g), and we shall consider his argument in light of that section.

Section 811 (g), as in effect at the time of decedent's death, provided:

SEC. 811. GROSS ESTATE.

The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated * * *

*       *       *       *       *       *       *

(g) PROCEEDS OF LIFE INSURANCE.— * * * to the extent of the excess over $40,000 of the amount receivable by all other beneficiaries as insurance under policies taken out by the decedent upon his own life.

As pointed out in *Estate of John E. Cain, Sr.*, 43 B. T. A. 1133, 1137, this subsection appears broad enough on its face to include in the gross estate the amounts receivable by any beneficiary other than the estate under any policy taken out by the decedent upon his own life. However, the scope of section 811 (g) has been limited by judicial decisions and by regulations to amounts receivable by a beneficiary other than the estate under a policy in which decedent retained a "legal interest" or a "legal incident of ownership" at the time of his death. *Estate of John E. Cain, Sr., supra.* Article 27 of Regulations 80, as amended by T. D. 5032, promulgated January 10, 1941, shortly before the decedent's death, contains such a limitation.[3]

In section 404 (a) of the Revenue Act of 1942 Congress expressly provided that "the term 'incident of ownership' does not include a reversionary interest" but subsection (c) of the same section limited application of the amendment in subsection (a) to estates of decedents "dying after the date of the enactment of this Act," which was October 21, 1942. The limitation on the term "incident of ownership" contained in the 1942 Act is not applicable here since the decedent died before that date.

The trust instrument of August 14, 1935, provided, *inter alia*, that if no issue of the decedent survived the decedent's wife, or, if the decedent having predeceased his wife, no issue survived him, the trustees were to pay the trust corpus then remaining to the

---

[3] Regulations 80 (as amended by T. D. 5032, promulgated Jan. 10, 1941) :

"ART. 25. * * * The term "insurance" refers to life insurance of every description * * *. Insurance receivable by beneficiaries other than the estate is considered to have been taken out by the decedent where he paid, either directly or indirectly, all the premiums or other consideration wherewith the insurance was acquired, whether or not he made the application. * * * Where a portion of the premiums or other consideration was actually paid by another and the remaining portion by the decedent, either directly or indirectly, such insurance is considered to have been taken out by the latter in the proportion that the payments therefor made by him bear to the total amount paid for the insurance.

* * * * * * *

"ART. 27. *Insurance receivable by other beneficiaries.*—The amount in excess of $40,000 of the aggregate proceeds of all insurance on the decedent's life not receivable by or for the benefit of his estate must be included in his gross estate as follows :

* * * * * * *

"(2) To the extent to which such insurance was taken out by the decedent upon his own life (see article 25) on or before January 10, 1941, and with respect to which the decedent possessed any of the legal incidents of ownership at any time after such date or, in the case of a decedent dying on or before such date, at the time of his death.

"Legal incidents of ownership in the policy include, for example, the right of the insured or his estate to its economic benefits, the power to change the beneficiary, to surrender or cancel the policy, to assign it, to revoke an assignment, to pledge it for a loan, or to obtain from the insurer a loan against the surrender value of the policy, etc. The insured possesses a legal incident of ownership if his death is necessary to terminate his interest in the insurance, as for example if the proceeds would become payable to his estate, or payable as he might direct, should the beneficiary predecease him."

residuary legatee or legatees named in the last will of the decedent, or in the event that decedent died intestate or without having named such residuary takers under his will, to the persons who would be entitled thereto had he died intestate as to such property. From this provision, it is clear that it was necessary for the life beneficiary and for the remaindermen, decedent's issue, under this trust to survive him in order for them to take under the trust. Until the time of the decedent's death, it was uncertain whether the trust corpus, consisting of the proceeds of insurance policies upon his life, would pass to the beneficiaries as provided in the trust instrument, or whether it would "become payable to his estate, or payable as he might direct."

Similarly, under the trust instrument executed on August 26, 1935, by decedent and Ryan jointly, the decedent reserved the power of appointing in his last will and testament the persons to whom one-half of the proceeds of the insurance policies obtained by the trustee should be paid if decedent's wife or issue were not living at the time of distribution. In default of such appointment, decedent's wife and issue being deceased, these amounts were payable to the persons who would be entitled thereto had decedent died on the date of the collection of the proceeds intestate as to such property. Thus, under this later trust instrument the same possibility existed that "the proceeds would become payable to his estate, or payable as he might direct, should the beneficiary predecease him."

Under the circumstances shown by the record, and on the authority of *Estate of Charles H. Thieriot*, 7 T. C. 1119, we conclude that decedent possessed a legal incident of ownership in the insurance upon his own life. Therefore, to the extent that such insurance was taken out by the decedent, the aggregate proceeds of the insurance in excess of $40,000 is includible in decedent's gross estate, pursuant to section 811 (g) of the Internal Revenue Code.

We consider it immaterial that the rights of decedent, his wife, and his children and their issue to the proceeds of the insurance on decedent's life are, by reason of the assignments here in question, derivative through the insurance trusts, rather than direct, pursuant to the terms of the insurance policies themselves. The provisions of section 811 (g) can not be avoided merely by the creation of insurance trusts by the insured. The fact that section 811 (c) of the Internal Revenue Code may also be pertinent to questions involving the taxation of such trusts, does not render inapplicable the provisions of section 811 (g). See *Estate of Louis J. Dorson*, 4 T. C. 463. This section, in our opinion, is not restricted to situations where the incidents of ownership arise by reason of the terms of the insurance policies, but is applicable as well where the incidents of ownership arise by reason of the terms of a trust instrument executed by an

insured creating a trust to which he assigns the insurance on his life.

The conclusion which we have reached need not be altered with respect to the trust instrument of August 14, 1935, by reason of the fact that, in the event of Abbie Ruthrauff's death during the decedent's lifetime, the individual trustee, who was also a remainderman, could have caused any of the policies of insurance to be surrendered and the proceeds thereof to be distributed as principal to the persons then entitled thereto under the trust instrument. In *Goldstone* v. *United States*, 325 U. S. 687, the wife of the insured had the unrestricted power during the insured's lifetime to exercise many important incidents of ownership over the insurance contracts, including the power to terminate the insured's reversionary interest in the proceeds. The Supreme Court stated in that case:

* * * Whatever the likelihood of the exercise of this power, it is a fact that the wife did not change the beneficiaries or surrender the contracts so as to destroy decedent's reversionary interest. The string that the decedent retained over the proceeds of the contracts until the moment of his death was no less real because of the wife's unused power to sever it at any time.

\* \* \* \* \* \* \*

In the case here before us the power of the individual trustee with respect to the policies of insurance was very limited as compared to the broad powers considered in the *Goldstone* case. In view of the holding in that case we are here, too, compelled to conclude that the string retained by the decedent over these policies of insurance "was no less real or significant" because of the trustee's limited power to sever it under certain conditions. See also *Estate of Charles H. Thieriot, supra.*

Petitioner also urges that, inasmuch as the parties to the trust agreements provided that the agreements should be construed at all times in accordance with the laws of the State of New York, the law of New York controls our determination of the nature of the interests retained by the decedent in the policies transferred to the trust. In *Anna Rosenstock*, 41 B. T. A. 635, and *Estate of Louis J. Dorson, supra,* both of which cases involved decedents dying in the State of New York and whose wills were probated in the courts of that state, it was held that the property rights in the policies there under consideration were to be determined by the laws of New York. Petitioners here urge that under the law of New York no reversionary interest or reverter of any character was retained by the settlor of these trusts, and they also make various other contentions with respect to the law of that state. We are not persuaded that any of the authorities cited by petitioners require a conclusion other than the one which we have reached. The problem which we have considered is whether the decedent had any "legal incidents of ownership" in these insurance policies at the time of his death. We have not had called to our attention any decisions

of the courts of New York holding that interests such as those retained by the decedent here did not amount to an "incident of ownership." Therefore, it is necessary for us to construe the nature of the decedent's interest ourselves.

The expenses paid in connection with the administration of the decedent's estate and set out in our findings should be allowed. If any of them have already been allowed by respondent as "miscellaneous administration expenses" in his determination of deficiency, they will, of course, not be allowed a second time.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

HILL, *J.*, concurring: I agree that the deficiency redetermined by the majority is correct, but I think the result is based on the wrong ground. Two determinative questions were presented and decided in this case, namely: (1) Whether the transfers in trust were made in contemplation of death, and (2) whether in such transfers there was an expressed retention of possibility of reverter. The majority answered (1) in the negative and (2) in the affirmative. I disagree with the holding as to both questions.

Considering question (1), the face amount of the policies transferred to the trust on August 14, 1935, aggregated $246,000. This trust gave the total income of the trust, payable annually, to the donor's wife for the period of her survivorship of the donor and assured her during such period annual payments of at least $12,000.

Under provisions of the trust for the payments to her during the donor's life of all dividends on the policies, disability benefits, and cash surrender values which might accrue, donor's wife received from August 1935 to the date of donor's death only $3,500 in dividends, which averages less than $700 a year. The maximum possible disability benefits she might have received under such provision of the trust was $2,150.50. The maturity of such disability benefits was, of course, contingent and the maturing contingency did not occur. Donor's wife had no power to effectuate the surrender of policies for cash.

It is true that under the August 14 trust the noncorporate trustee could, in the event of Abbie's death during decedent's lifetime, surrender the policies for cash and distribute the proceeds to those entitled thereto under paragraph sixth. It is also true that under the August 26 trust the trustee was required to surrender the policies for cash on receipt of notice of a 20-day premium default. On the basis of these provisions it might be argued that there was the possibility of possession and enjoyment during decedent-donor's lifetime and that therefore the transfers were not testamentary in the sense that donor's death

was the *sine qua non* to beneficial enjoyment. However, the mere possibility of possession or enjoyment during decedent-donor's lifetime does not alter the fact that the general plan, overriding purpose and predominant intention, in making the transfers was to establish a fund to care for decedent-donor's family in the event of his death. This being the predominant purpose of the transfers, the mere possibility of enjoyment during decedent-donor's lifetime does not, in my opinion, alter the testamentary nature of the transfers. As was said in *First Trust & Deposit Co.* v. *Shaughnessy*, 134 Fed. (2d) 940:

\* \* \* There is not a syllable of evidence to show that the enlarged powers reserved to the settlor in the 1935 trust were put there because she was expected to exercise them so as to make use of the policies during her life. That he [husband] expected that she *might* do so, does not help to show that he regarded that power as of greater importance than his testamentary dispositions. Until the plaintiffs showed some reason for supposing that he was actuated more by the first, than by the second, purpose, they made no step towards a verdict, and they had the burden of proof. \* \* \*

Under the circumstances detailed it appears obvious that the principal economic benefits provided by the trust for donor's wife were intended to, and could, be attained only through the collection and investment of the proceeds of the insurance policies upon the death of the donor. In comparison with such benefits, the other potential benefits were exceedingly minor in importance.

Aside from these minor benefits provided by the trusts for enjoyment during the life of the donor, all benefits under both trusts herein involved were available to the beneficiaries for use and enjoyment only at or after the death of the donor.

The income from the trust to donor's wife came only from investments of proceeds of the insurance policies after donor's death. The distribution to remaindermen of the principal of the trust could be made only after the donor's death.

The remaindermen, first in order to take, were the donor's issue. In the event none survived him he could provide by will residuary legatees of his estate who would be next in order as remaindermen. If he made no will or did not provide by will for residuary legatees, the next in order as remaindermen were the same persons who would inherit undevised or unbequeathed property, if any, of the donor upon his death.

The death of the donor was the event which made the proceeds of insurance policies available for the production of the trust income payable to his wife. His death determined whether he would be survived by issue and, if so, who of such issue survived him. It was the donor's death that ended his power to make, change, or revoke wills, and thus only at his death could it be determined whether he had constituted any residuary legatees of his estate and if so, who

they were. Residuary legatees were the second in order of designated remaindermen under the trust. Only at donor's death could it be known or ascertained who were entitled to receive property of his estate if, as to which, he had died intestate. This class of persons was the third in order of such designated remaindermen. In short, until the death of the donor it could not be known or ascertained who were the remaindermen under the trust.

It occurs to me that where, as is illustrated by the above analysis of facts, the death of a donor of a trust initiates the enjoyment of substantially all benefits under the trust and marks the time as of which the ascertainment of who such beneficiaries are, it may logically be held that the whole trust arrangement was made in contemplation of death. I think it would not require a strained evaluation of such evidence to find and hold that such trust arrangement was testamentary in character.

Does the conclusion that enjoyment was intended to be postponed until decedent's death indicate a transfer in contemplation of death? An affirmative answer is indicated by the following excerpt from *First Trust & Deposit Co., supra:*

\* \* \* Had his wife not reserved the powers which she did to break the trust, there could not have been the least question that her intent in creating it—and therefore Ballard's intent—would have brought the gift within the statute, for it would have been in every particular a substitute for a testamentary disposition. This would have been equally true, if Ballard had lived for fifteen years; it would have been equally true, if he had not intended to avoid the estate tax. *He would have given her property which he intended to be unavailable for any beneficial purpose until after his death and to become the equivalent of a bequest thereafter.* \* \* \* [Italics supplied.]

In *Estate of Arthur D. Cronin,* 7 T. C. 1403, we held that complete transfers of insurance policies on decedent's life to his wife were made in contemplation of death within the meaning of section 811 (c), Internal Revenue Code, on facts found that it was the intention of the parties that the policies of insurance should be kept in effect with the objective that his wife should receive the proceeds of the policies upon Cronin's death, notwithstanding the fact that the wife received dividends on some of the policies during the transferor's life. It was apparent in that case that it was the intention that the wife should receive the largest possible economic benefit from the transfers by collecting the full face value of the policies upon her husband's death. This being the main purpose of the transfers, we held that the fact that she did not come into enjoyment and possession of the greater benefits of the transfers until after her husband's death was a supporting circumstance in establishing "contemplation of death."

In *Estate of Paul Garrett,* 8 T. C. 492, we held that transfers in trust by decedent to his wife of life insurance policies and of income-

producing securities, the income from which was to be used in part for the maintenance of the insurance policies, were, to the extent of the insurance and the proportion of capital necessary to sustain it, transfers made in contemplation of death.

The language of *Vanderlip* v. *Commissioner*, 155 Fed. (2d) 152; certiorari denied, 329 U. S. 728, is replete with the idea that, where an *inter vivos* transfer is so designed as to postpone beneficial enjoyment until the transferor's death, the transfer is one in contemplation of death. In *Thomas* v. *Graham*, 158 Fed. (2d) 561, it was said:

> The trust merely kept in force decedent's life insurance policies during his life and economic benefits were intentionally and effectually withheld until after his death. Although the trial judge found that the transfers were not made in contemplation of death, we are of opinion that a construction of the trust instrument demands a contrary finding.

As evidenced by the cited cases, I think it clear that the transfers in the instant case were made in contemplation of death. Also, it appears to me that transfers are inherently in contemplation of death when the identities of the transferees are ascertainable only at the death of the transferor and the use and enjoyment of the property rights transferred begin only at or after the transferor's death.

Question 2 in this case has to do with the subject of possibility of reverter. The donor designated as last in line to take the trust property after his death the same persons who would be entitled to receive the property constituting the trust corpus had that property devolved as intestate property. This latter provision is the one upon which the majority holding of possibility of reverter is based. To hold that this provision introduces a possibility of reverter of the trust property necessarily implies, it seems to me, that this last designated group of deferred remaindermen, if they receive the trust property, will receive it from the estate of the donor and not from the trust. In other words, such holding implies that the trust corpus would first revert to donor's estate and descend therefrom to such designated group of remaindermen. The trust instrument designates this group as remaindermen contingent upon there being neither surviving issue nor residuary legatees. The group so designated as contingent remaindermen is made ascertainable and identifiable by reason of their inheritable relationship under law to the trust donor, but when so ascertained and identified they take as remaindermen and not by inheritance. If the contingency should arise that would make them remaindermen under the trust, it appears to me that they would take direct from the trust and not from or through the donor's estate. Therefore, I think that the provisions of the trust instrument afford no basis for a claim of reverter, possible or at all, of the trust property to the donor's estate.