240 F.2d 930
 The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY et al., Plaintiffs-Appellants,
v.
CITY OF CHICAGO, a municipal corporation, et al., Defendants-Appellees, and
Parmelee Transportation Company, Defendant-Intervenor-Appellee.
 No. 11692.
 United States Court of Appeals Seventh Circuit.
 January 17, 1957.
 Rehearing Denied February 20, 1957.
 
 COPYRIGHT MATERIAL OMITTED Amos M. Mathews, Benjamin F. Goldstein, Edwin A. Wahlen, J. D. Feeney, Jr., Chicago, Ill., for appellant Railroad Companies.
 Lee A. Freeman, John C. Melaniphy, Chicago, Ill., for appellee.
 Before MAJOR, SWAIM and SCHNACKENBERG, Circuit Judges.
 SCHNACKENBERG, Circuit Judge.
 
 
 1
 Twenty-one railroads,[1] herein sometimes referred to as Terminal Lines, and Railroad Transfer Service, Inc., sometimes herein referred to as Transfer, on October 24, 1955 brought an action in the district court against defendant City of Chicago, sometimes herein referred to as the city, and certain officials thereof.[2] Plaintiffs' complaint seeks a declaratory judgment and injunctive relief against the enforcement against them of an ordinance known as chapter 28 of the municipal code of Chicago, as amended by an ordinance enacted July 26, 1955. Plaintiffs asked the district court to declare by its judgment, inter alia, that the ordinance, as amended in 1955, is void as applied to them.
 
 
 2
 Parmelee Transportation Company, sometimes herein referred to as Parmelee, on its petition was granted leave to intervene as a defendant.[3]
 
 
 3
 On motion of defendants, other than Parmelee, pursuant to rule 56 of the Federal Rules of Civil Procedure,[4] and on the pleadings, affidavits and exhibits submitted by all parties, the district court on January 12, 1956 granted a summary judgment against plaintiffs and dismissed their action.[5] 136 F.Supp. 476. From said judgment this appeal was taken.[6]
 
 
 4
 The undisputed facts we now set forth.
 
 
 5
 There are eight passenger terminals in downtown Chicago, each being used by from one to six railroads. No one railroad passes through Chicago, but about 3900 railroad passengers daily travel through Chicago on continuous journeys which begin and end at points outside Chicago. At Chicago, they transfer from an incoming, to an outgoing, railroad. The only practical method of transferring these passengers between the different terminal stations is by motor vehicle equipped to carry them and their hand baggage simultaneously. More than 99 per cent of the passengers so transferred between terminal stations are traveling on through tickets between points of origin and destination located in different states. They are carried over public ways of the city.
 
 
 6
 Transfer began its operations on October 1, 1955, but has not applied to the city for public passenger terminal vehicle licenses. These transfer operations are required by a tariff filed with the Interstate Commerce Commission.[7] They have been provided for by tariffs for more than the past forty years.
 
 
 7
 Pursuant to such tariffs a passenger traveling through Chicago purchases at his point of origin a railroad ticket composed of a series of coupons covering his complete transportation to his destination. If his through journey requires him to transfer from one railroad passenger terminal in Chicago to another, a part of his ticket consists of a coupon good for the transfer of himself and his hand baggage between such terminals. The expense of the required transfer service is absorbed by the railroads.
 
 
 8
 The tariffs provide that any such required transfer service shall be without additional charge where a one-way fare from Chicago to destination would be more than a specified minimum sum. Where such fare would be less than such minimum, a fixed charge which varies with the fare must be added to cover the required transfer service.
 
 
 9
 Prior to October 1, 1955, there had existed for many years arrangements between the Terminal Lines and Parmelee whereby it furnished this service for coupon-holding passengers. On June 13, 1955, the Terminal Lines ended their arrangement with Parmelee effective September 30, 1955. Under date of October 1, 1955, the Terminal Lines and Transfer executed a contract. In brief, this contract[8] provides that, upon delivery of a transfer coupon to Transfer by a through-passenger, it will carry him and his hand baggage from the incoming to the appropriate outgoing station without charge. Transfer is compensated by the outgoing terminal railroad. Transfer is given the exclusive right to perform this transfer service. Transfer devotes its vehicles exclusively to service under the contract.[9]
 
 
 10
 On and prior to June 13, 1955, there was in effect an ordinance of the city, being said chapter 28 of the municipal code, consisting of sections 28-1 to 28-32,[10] for the regulation of "Public Passenger Vehicles." Section 28-1 contained the following definitions, inter alia:
 
 
 11
 "`Public passenger vehicle' means a motor vehicle, as defined in the Motor Vehicle Law of the State of Illinois, which is used for the transportation of passengers for hire, excepting those devoted exclusively for funeral use or in operation of a metropolitan transit authority or public utility under the laws of Illinois."
 
 
 12
 * * * * *
 
 
 13
 "`Terminal vehicle' means a public passenger vehicle which is operated under contracts with railroad and steamship companies, exclusively for the transfer of passengers from terminal stations."
 
 Section 28-31 provided:
 
 14
 "28-31. No person shall be qualified for a terminal vehicle license unless he has a contract with one or more railroad or steamship companies for the transportation of their passengers from terminal stations.
 
 
 15
 "It is unlawful to operate a terminal vehicle for the transportation of passengers for hire except for their transfer from terminal stations to destinations in the area bounded on the north by E. and W. Ohio Street; on the west by N. and S. Desplaines Street; on the south by E. and W. Roosevelt Road; and on the east by Lake Michigan."
 
 
 16
 Certain other parts of chapter 28 incorporated regulations enacted pursuant to the police power of the city.[11]
 
 
 17
 Parmelee was, on and prior to September 30, 1955, the only person having a transfer contract with the Terminal Lines and licensed to operate terminal vehicles under the ordinance.
 
 
 18
 At a meeting of the committee on local transportation of the Chicago city council held on July 21, 1955, the chairman stated that recently he had been advised by the Vehicle License Commissioner that he had received a communication from Parmelee advising that its contract with the railroads was to be canceled out in September of that year, "which would make it appear that the railroads were taking the position of dictating who would or could operate terminal vehicles in Chicago; that he did not think that was right and had prepared an ordinance with the assistance of Mr. Gross, and had it introduced in the city council and referred it to the committee; that subsequently he had discussed said ordinance with Mr. Grossman of the corporation counsel's office and that, as a result of his conference with Mr. Grossman, it would appear that, while he was on the right track in the matter, his method of approach was wrong."
 
 
 19
 Mr. Grossman informed the committee that he had looked over the ordinance "as introduced" by the chairman and was of the opinion that it was not in proper form; but that he believed the objective could be obtained in some other way. He said he would endeavor to prepare and submit an ordinance on this subject.
 
 
 20
 The chairman's proposed ordinance, which met with Mr. Grossman's objection as to form, and which was laid aside, in brief would have granted an exclusive franchise for ten years to Parmelee for the operation of terminal vehicles to transfer passengers and their baggage between railroad stations.[12]
 
 
 21
 On July 26, 1955, the chairman stated that the committee was in session to receive a report from Mr. Grossman who had prepared a substitute ordinance which would accomplish what the committee had in mind, namely, placing the licensing and operation of terminal vehicles under the complete control of the city of Chicago, whereas, as the code then provided, the only one who could secure a license for the operation of a terminal vehicle was someone who had a contract with the railroads.
 
 
 22
 On recommendation of the committee, the council on the same day passed the ordinance now under attack.[13]
 
 
 23
 1. The city and Parmelee concede that Transfer is engaged in interstate commerce. In United States v. Yellow Cab Co., 332 U.S. 218, 228, 67 S.Ct. 1560, 1566, 91 L.Ed. 2010, Parmelee's operation (including that part now being carried on by Transfer) was held to be an integral step in an interstate movement and therefore, a constituent part of interstate commerce.[14] The court pointed out that Chicago is the terminus of a large number of railroads engaged in interstate passenger traffic and that a great majority of the persons making interstate railroad trips which carry them through Chicago must disembark from a train at one railroad station, travel from that station to another some two blocks to two miles distant, and board another train at the latter station; that Parmelee had contracted with the railroads to provide this transportation by special cabs carrying seven to ten passengers. The court said that Parmelee's contracts were exclusive in nature, adding:
 
 
 24
 "The transportation of such passengers and their luggage between stations in Chicago is clearly a part of the stream of interstate commerce. When persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character. The Daniel Ball, 10 Wall. 557, 565, 19 L.Ed. 999. That portion must be viewed in its relation to the entire journey rather than in isolation. So viewed, it is an integral step in the interstate movement. See Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735.
 
 
 25
 "Any attempt to monopolize or to impose an undue restraint on such a constituent part of interstate commerce brings the Sherman Act [15 U.S.C.A. §§ 1-7, 15 note] into operation. * * *"
 
 
 26
 Obviously these holdings conform with the following well-established principles: (1) a state may not obstruct or lay a direct burden on the privilege of engaging in interstate commerce, Furst v. Brewster, 282 U.S. 493, 498, 51 S.Ct. 295, 75 L.Ed. 478; Michigan Commission v. Duke, 266 U.S. 570, 577, 45 S.Ct. 191, 69 L.Ed. 445; but (2) nevertheless it may incidently and indirectly affect it by a bona fide, legitimate, and reasonable exercise of its police power. 15 C.J.S., Commerce, § 10, p. 266. In Dahnke-Walker Milling Co. v. Bondurant, 257 U.S. 282, 290, 42 S.Ct. 106, 108, 66 L.Ed. 239, the court said:
 
 
 27
 "The commerce clause of the Constitution, (Art. I, § 8, cl. 3) expressly commits to Congress and impliedly withholds from the several States the power to regulate commerce among the latter. Such commerce is not confined to transportation from one state to another, but comprehends all commercial intercourse between different states and all the component parts of that intercourse. * * *"
 
 
 28
 The power here referred to may be exercised, not only in an act of Congress, but also in a regulation by the Interstate Commerce Commission. 15 C.J.S., Commerce, § 15, p. 274.
 
 
 29
 Part I of the Interstate Commerce Act[15] deals with railroads as well as other subjects not relevant here. Section 3(4) thereof, in its presently pertinent provisions, appeared in the original act of February 4, 1887.[16] It provides that all carriers of passengers subject to the act shall afford all reasonable facilities for the interchange of traffic between their respective lines and for the receiving, forwarding and delivering of passengers to and from connecting lines.[17] Central Transfer Co. v. Terminal R., 288 U.S. 469, 473, note 1, 53 S.Ct. 444, 77 L.Ed. 899.
 
 
 30
 Part II of the same act[18] deals with motor carriers. As amended in 1940 and 1942, 302(c)[19] provides as follows:
 
 
 31
 § 202(c) "Notwithstanding any provision of this section or of section 203, the provisions of this part, [Part II], except the provisions of section 204 relative to qualifications and maximum hours of service of employees and safety of operation and equipment, shall not apply —
 
 
 32
 "(1) to transportation by motor vehicle by a carrier by railroad subject to part I, * * * incidental to transportation or service subject * * * [thereto] in the performance within terminal areas of transfer, collection, or delivery services; but such transportation shall be considered to be and shall be regulated as transportation subject to part I when performed by such carrier by railroad * * *;
 
 
 33
 "(2) to transportation by motor vehicle by any person (whether as agent or under a contractual arrangement) for a common carrier by railroad subject to part I, * * * in the performance within terminal areas of transfer, collection, or delivery service; but such transportation shall be considered to be performed by such carrier * * * as part of, and shall be regulated in the same manner as, the transportation by railroad, * * * to which such services are incidental."
 
 
 34
 In Part I, § 6(1) of the Interstate Commerce Act[20] requires every common carrier to file with the commission tariffs (therein referred to as schedules), for transportation, including joint rates over through routes. In this respect a tariff is to be treated the same as a statute. Pennsylvania R. Co. v. International Coal Min. Co., 230 U.S. 184, at page 197, 33 S.Ct. 893, at page 896, 57 L.Ed. 1446, 1451.
 
 
 35
 Relevant tariffs were filed with the Interstate Commerce Commission on behalf of the Terminal Lines.
 
 
 36
 The agreement of October 1, 1955[21] obligates Transfer to perform all the required passenger and hand baggage transfer service from the terminal station in Chicago of each incoming line to the terminal station in Chicago of each outgoing line, all at the expense of the latter, for the period beginning October 1, 1955 and ending September 30, 1960. This service (which has been since October 1, 1955 performed by Transfer) replaced the Parmelee service, with the exception of two types of operations local in their nature,[22] consisting of (a) transportation of friends or relatives accompanying a coupon holder between stations, and (b) transportation of a coupon holder to any hotel or other terminus "in the loop district of Chicago", as requested of the driver by the coupon holder.
 
 
 37
 2. We conclude that Transfer is an instrumentality used by Terminal Lines in interstate commerce and is subject to control of the federal government. We also conclude that the city can neither give nor take away such authority of Transfer to operate and that the city has no power of control over Transfer, except the control which it has generally in exercising its police power pertaining to such matters as public safety, maintenance of streets and the convenient operation of traffic. For a more detailed statement of the scope of such police power, see Continental Baking Co. v. Woodring, 286 U.S. 352, 52 S.Ct. 595, 76 L.Ed. 1155.
 
 
 38
 This is not a case in which a motor vehicle operator is denied the privilege of operating on a particular highway because of the congestion of traffic thereon, such as was true in Bradley v. Public Utility Commission, 289 U.S. 92, 53 S.Ct. 577, 77 L.Ed. 1053 (on which, for some reason not clear to us, the city relies), but rather we have a case where an ordinance, in effect, bars Transfer from the entire network of highways within the downtown area of Chicago.
 
 
 39
 Pursuant to federal law, Terminal Lines have assumed an obligation to furnish the service in question as an interstation link in interstate commerce. The integration of this service with the complex, and occasionally changing, schedules of the Terminal Lines and the ebb and flow of passenger traffic existing in the various stations, requires a continuing and intimate knowledge thereof, which the Terminal Lines possess. The city is not equipped to function effectively in this area. It follows that the choice as to the instrumentality to be used for that purpose properly belongs to the Terminal Lines. These facts preclude the selection of an operator of terminal vehicles by anyone other than the Terminal Lines. While the city has power to regulate the operation of terminal vehicles incidently to its regulation of street traffic generally, it has no power, directly or indirectly, to designate who shall own or operate such vehicles. The prior ordinance recognized this situation. It was limited to terminal vehicles having contracts with the Terminal Lines and, as to which vehicles, it exercised certain police powers of the city relating to traffic regulation. That ordinance made no attempt, and it was not intended, to select the operator of the service. In contrast, the 1955 ordinance consists of provisions which, in effect, name Parmelee as the exclusive operator of terminal vehicles in Chicago even though it has no contract with the Terminal Lines which are under a federally imposed obligation to furnish this terminal facility. Each of the Terminal Lines, which sells through tickets calling for interstate transportation in Chicago, thereby assumes an individual obligation to the passenger to furnish that service. Yet, under the 1955 ordinance, that railroad would have no direct control over the operator of that service and no opportunity to protect itself by an agreement indemnifying it from claims of passengers for damages arising out of the negligence of the operator. Other obvious considerations point to the practical necessity of a continuing control by the Terminal Lines of the instrumentality furnishing the service covered by the coupons sold by those lines to interstate passengers.
 
 
 40
 3. However, the city contends that the 1955 ordinance not only retains the police regulations of the prior ordinance, but demonstrates the city's concern with all passenger vehicles for hire, and specifically with the effect of the number of taxicabs as well as terminal vehicles on the safety of existing vehicular and pedestrian traffic. The city contends that in this respect the ordinance is valid as an exercise of the police power.
 
 
 41
 But the Terminal Lines argue that the 1955 ordinance was adopted for the sole and evident purpose, not of police power regulation, but of economic regulation. They say that, not only would the 1955 ordinance add nothing in respect to police power regulations that were not contained in the prior ordinance, but that the 1955 ordinance added "elaborate requirements for proof of public convenience and necessity and other elements of economic regulation of interstate commerce * * *." They add "that these new economic regulations would apply to all except Parmelee; Parmelee was granted a perpetual franchise free from these requirements. The amendment eliminated the requirement that no one could obtain a license unless he had a contract for interstation transfer with the railroads. The amendment unmistakably marked the ordinance as an economic regulation not within the city's power."
 
 
 42
 Significant is § 28-31.1 of the 1955 ordinance which provides that no license for any terminal vehicle shall be issued except in the annual renewal of such license or upon transfer to permit replacement of a vehicle for that licensed, unless, after a public hearing, the commissioner shall report to the council that public convenience and necessity require additional terminal vehicle service and shall recommend the number of such vehicle licenses which may be issued. It is further provided that, in determining whether public convenience and necessity require such additional service, the following, inter alia, shall be considered: "2. The effect of an increase in the number of such vehicles on the safety of existing vehicular and pedestrian traffic in the area of their operation; * * *".
 
 
 43
 Terminal Lines argue that these are the only provisions of the 1955 ordinance which could even appear to relate to public safety. But they aver that, as a purported safety measure, this is sham and spurious.
 
 
 44
 To us it appears that the cost of maintaining the terminal vehicle service, which is initially borne by Transfer and ultimately, to the extent of coupons issued and used, by the individual Terminal Lines, will operate effectively as an economic brake upon any unjustified increase in the number of such vehicles. Moreover, if and when a greater number is demanded by the growth of interstate passenger traffic, the city would then have no right, in the guise of an exercise of its police power, to cripple interstate commerce by preventing a justifiable increase in the number of such vehicles required to meet the needs of that commerce.
 
 
 45
 We are thus led to conclude that there is no valid legal basis for the above-cited provisions of § 28-31.1 of the 1955 ordinance. We are convinced that those provisions, which would in effect limit the number of terminal vehicle licenses to those held by Parmelee on July 26, 1955 and give Parmelee perpetual control thereof, constitute a designation of Parmelee by the council of the city, in lieu of Transfer, the instrumentality selected by the Terminal Lines, rather than an exercise of the city's police power over traffic. In this critical aspect the 1955 ordinance is invalid. If there were any doubt that this conclusion is correct, the legislative history of the ordinance dispels that doubt.
 
 
 46
 At meetings of the committee which recommended the 1955 ordinance for passage, the committee chairman made it clear that the objective sought was the assumption by the city of the authority to designate the instrumentality which was to operate terminal vehicles between railroad stations in Chicago. The proceedings of the committee fail to indicate that the chairman or any member of the committee was interested in traffic regulations or any other aspect of the city's police power.
 
 
 47
 In attempting to justify the 1955 ordinance, which admittedly retained police regulations contained in the prior ordinance, the city points to photographs of two transfer vehicles which, the city says, do not comply with retained § 28-4.1, which provides that no vehicle having a seating capacity for more than 7 passengers shall be licensed as a public passenger vehicle unless at least 3 doors on each side or a fixed aisle space is provided, and retained § 28-17, which provides that it is unlawful to permit more than one passenger to occupy the front seat with the chauffeur. There is no indication in the record that any terminal vehicles used by Transfer, except the two appearing in the photographs, violate § 28-4.1. Even if § 28-4.1 and § 28-17 are violated, that fact does not empower the city to bar, or even suspend, the operations of Transfer. Castle v. Hayes Freight Lines, 348 U.S. 61, 75 S.Ct. 191, 99 L.Ed. 68. The fact that Hayes was operating trucks under a federal certificate of convenience and necessity, under Part II of the Interstate Commerce Act,[23] does not distinguish that case in principle from the present case in which Transfer is engaged in a federally authorized activity. See 49 U.S.C.A. § 302(c) (2), supra. If Transfer's vehicles do not conform to the requirements contained in the prior ordinance,[24] the city may refuse to issue licenses for the nonconforming vehicles and penalize their unlicensed operation in accord with § 28-32. So, also, whenever Transfer is found guilty of violating § 28-17 the city may proceed against it according to the penalties section.[25]
 
 
 48
 Undoubtedly the city has power to require that one engaged exclusively in interstate commerce may be required to procure from the city a license granting permission to use its highways and in addition pay a license fee demanded of all persons using automobiles on its highways as a tax for the maintenance of the highways and the administration of the laws governing the same. Highways being public property, users of them, although engaged exclusively in interstate commerce, are subject to regulation by the state or municipality to ensure safety and convenience and the conservation of the highways. Users of them, although engaged exclusively in interstate commerce, may be required to contribute to their cost and upkeep. Common carriers for hire, who make the highways their place of business, may properly be charged a tax for such use. Clark v. Poor, 274 U.S. 554, 557, 47 S.Ct. 702, 71 L.Ed. 1199.
 
 
 49
 Both the language of the 1955 ordinance and its legislative history point to the fact that it is not legislation governing the manner of conducting a business or providing for a contribution toward the expense of highway maintenance, but that it requires a license, the granting of which, in turn, is made dependent upon the consent of the city to the prosecution of a business. This is not a valid requirement. See City of Sault Ste. Marie v. International Transit Co., 234 U.S. 333, 340, 34 S.Ct. 826, 58 L.Ed. 1337, 1340.
 
 
 50
 As we have seen, the 1955 ordinance eliminated from § 28-1 of the prior ordinance a requirement that a terminal vehicle must be operated under contracts with railroad and steamship companies, and, by a new section, § 28-31.1, in effect permitted Parmelee's existing terminal vehicle licenses to become perpetual by means of annual renewal or by transfer to a replacement vehicle, and also provided, in effect, that Transfer could not obtain any terminal vehicle license unless it proved to the satisfaction of the public vehicle license commissioner "that public convenience and necessity shall require additional terminal vehicle service".
 
 
 51
 In Buck v. Kuykendall, 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623, it appears that Buck wished to operate an autostage line as a common carrier for hire for through interstate passengers, over a public highway in the state of Washington. Having complied with the state laws relating to motor vehicles and owners and drivers, and alleging willingness to comply with all applicable regulations concerning common carriers, Buck applied to the state for a prescribed certificate of public convenience and necessity. It was refused on the ground that the territory involved was already being adequately served by the holder of a certificate and that adequate transportation facilities were already being provided by four connecting autostage lines, all of which held such certificates from the state. The state relied upon its statute which prohibited common carriers for hire from using the highways by auto vehicles between fixed termini, or over regular routes, without having first obtained from the state a certificate of public convenience and necessity. Speaking of that statute, the court said, 267 U.S. at page 315, 45 S.Ct. at page 326:
 
 
 52
 "* * * Its primary purpose is not regulation with a view to safety or to conservation of the highways, but the prohibition of competition. It determines, not the manner of use, but the persons by whom the highways may be used. It prohibits such use to some persons, while permitting it to others for the same purpose and in the same manner. * * * Thus, the provision of the Washington statute is a regulation, not of the use of its own highways, but of interstate commerce. Its effect upon such commerce is not merely to burden, but to obstruct it. Such state action is forbidden by the commerce clause. * * *"
 
 
 53
 To the same effect is Mayor and Board of Aldermen of Town of Vidalia v. McNeely,[26] 274 U.S. 676, at page 683, 47 S.Ct. 758, at page 761, 71 L.Ed. 1292.
 
 
 54
 4. We hold that it was unnecessary for Transfer to apply for licenses under the 1955 ordinance, because the issuance thereof unlawfully required a consent by the city to the prosecution of Transfer's business and was not merely a step in the regulation thereof. Being unnecessary, the relief prayed for herein may be granted without a showing that such application had been made before this suit was filed.
 
 
 55
 For the reasons hereinbefore set forth, the judgment of the district court is reversed and this cause is remanded to that court for further proceedings not inconsistent with the views herein set forth.
 
 
 56
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 The Atchison, Topeka and Santa Fe Railway Company; The Baltimore and Ohio Railroad Company; The Chesapeake and Ohio Railway Company; Chicago, Burlington & Quincy Railroad Company; Chicago & Eastern Illinois Railroad Company; Chicago Great Western Railway Company; Chicago, Indianapolis and Louisville Railway Company; Chicago, Milwaukee, St. Paul & Pacific Railroad Company; Chicago North Shore and Milwaukee Railway; Chicago and North Western Railway Company; Chicago, Rock Island & Pacific Railroad Company; Chicago South Shore and South Bend Railroad; Erie Railroad Company; Grand Trunk Western Railroad Company; Gulf, Mobile and Ohio Railroad Company; Illinois Central Railroad Company; Minneapolis, St. Paul & Sault Ste. Marie Railroad Company; The New York Central Railroad Company; The New York, Chicago and St. Louis Railroad Company; The Pennsylvania Railroad Company; and the Wabash Railroad Company
 
 
 [2]
 Richard J. Daley, as mayor; John C. Melaniphy, as acting corporation counsel; Timothy P. O'Connor, as commissioner of police; and William P. Flynn, as public license commissioner
 
 
 [3]
 The district court considered the petition as an answer to the complaint
 
 
 [4]
 Fed.Rules of Civil Procedure, rule 56, 28 U.S.C.A
 
 
 [5]
 On the same day the district court filed "findings of fact" and "conclusions of law", one conclusion being that there is no genuine issue of fact involved in this controversy
 
 
 [6]
 On January 13, 1956 the district court ordered that defendants, other than Parmelee, be enjoined from enforcing the ordinance in question against plaintiffs upon the latter filing supersedeas bond of $50,000. It is our understanding that this bond was filed
 
 
 [7]
 Local and Joint Passenger Tariff No. 3 governing,inter alia, passengers and baggage transfer between stations in Chicago, was filed with the Interstate Commerce Commission on behalf of Terminal Lines. On page 11 of said tariff, in Section 2 thereof, the Terminal Lines are listed according to the Chicago stations which they enter and it is set forth in Section 2 thereof that transfer is required between all railroad stations when transfer is necessary, and in Column 4 appears "Passenger transfer included", while in Column 5 there appears "Transfer of all baggage included".
 Page 5 of said tariff in Section 1 thereof provides in rule 4, in part, as follows:
 "Through Transportation. (a) Where it is designated in Column 4, Section 2, that passenger transfer is included, transfer coupon must be included in through ticket without additional collection."
 And rule 6 in Section 1, in part, provides:
 "Through Transportation. (a) Where it is designated in Column 5, Section 2, that baggage transfer is included, baggage may be checked through without additional collection."
 
 
 [8]
 On or about September 19, 1955, the railroads filed copies of the contract with the Interstate Commerce Commission and with the Illinois Commerce Commission
 
 
 [9]
 The contract also provides that Transfer shall perform certain additional baggage transfer services for Terminal Lines. The transfer of a passenger'schecked baggage by Transfer in vehicles other than "terminal vehicles", although covered by terms of the contract between Terminal Lines and Transfer, as well as actually performed by Parmelee prior to October 1, 1955, is not involved in this case.
 
 
 [10]
 Herein sometimes referred to as the prior ordinance
 
 
 [11]
 These are provisions for granting and suspension of licenses, safety regulations based on the type of vehicle, number of passengers permitted, condition and maintenance of vehicles, inspection thereof, etc., financial responsibility of operators, investigation of character of prospective licensees and continuing supervision thereof, requirements for maintenance of adequate insurance, determination of public convenience and necessity with respect to number of certain intrastate vehicles, i. e. livery and taxicabs, which are to be permitted on the city streets, and regulation of taxi fares through meters
 
 
 [12]
 § 2 read: "Subject to all the conditions of this ordinance, exclusive permission and authority is hereby granted to the licensee to operate terminal vehicles in the City for a period of ten (10) years, commencing on * * *, 1955, and ending on * * *, 1965."
 § 4 provided: "It is unlawful for any person to be an operator of one or more terminal vehicles on any public way from place to place within the corporate limits of the city unless such terminal vehicles are licensed by the City as terminal vehicles. * * *"
 § 11 provided: "Upon the effective date of this ordinance, the commissioner shall issue licenses hereunder to licensee in not to exceed the number of licenses held by such licensee on April 1, 1955. * * *"
 
 
 [13]
 Herein sometimes referred to as the 1955 ordinance
 
 
 [14]
 The destination intended by the passenger when he begins his journey and known to the carrier, determines the character of the commerce, whether interstate or not. Sprout v. City of South Bend, 277 U.S. 163, 168, 48 S.Ct. 502, 72 L.Ed. 833
 
 
 [15]
 49 U.S.C.A. §§ 1-27
 
 
 [16]
 § 3, second unnumbered paragraph, 24 Stat. 380
 
 
 [17]
 There is no warrant for limiting the meaning of "connecting lines" to those having a direct physical connection. The term is commonly used as referring to all the lines making up a through route. Atlantic Coast Line R. Co. v. U. S., 284 U.S. 288, 293, 52 S.Ct. 171, 76 L.Ed. 298
 
 
 [18]
 49 U.S.C.A. §§ 301-327
 
 
 [19]
 56 Stat. 300, where this section is known as section 202(c)
 
 
 [20]
 49 U.S.C.A. § 6(1)
 
 
 [21]
 The Baltimore and Ohio Chicago Terminal Railroad Company, Chicago and Western Indiana Railroad Company and Chicago Union Station Company, therein referred to as "depot companies", are also parties to said agreement. That fact is not controlling in the decision of this case
 
 
 [22]
 See Status of Parmelee Transp. Co., 288 I.C.C. 95, at 100
 
 
 [23]
 49 U.S.C.A. § 301 et seq
 
 
 [24]
 Ch. 28, Chicago Municipal Code
 
 
 [25]
 § 28-32. "Any person violating any provision of this chapter for which a penalty is not otherwise provided shall be fined not less than $5.00 nor more than $100.00 for the first offense, not less than $25.00 nor more than $100.00 for the second offense during the same calendar year, and not less than $50.00 nor more than $100.00 for the third and succeeding offenses during the same calendar year and each day that such violation shall continue shall be deemed a separate and distinct offense."
 
 
 [26]
 Both sides in the case at bar rely on Columbia Terminals Co. v. Lambert, D.C., 30 F.Supp. 28, appeal dismissed, 309 U.S. 620, 60 S.Ct. 471, 84 L.Ed. 984. The court there said that the question whether the state could demand that Columbia Terminals prove that its interstate commerce transfer operation would benefit the state, in order to obtain a state permit therefor, was not before it, because the state expressly admitted it lacked such power and made no such demand. The court said, 30 F.Supp. at page 31:
 "Since this Statute applies to interstate as well as intrastate contract haulers, if the complaint alleged or the evidence disclosed such action on the part of the State Commission, plaintiff would be entitled to relief from such action on the part of the state officials. * * * But when the State * * * undertakes to exercise the right to say what interstate commerce will benefit the State and what will not, such action, with certain exceptions immaterial here, constitutes an unconstitutional violation of the commerce clause."
 While this is dictum, it is in accord with our holding herein.