ESTATE OF ARTHUR H. HULL, DECEASED, CENTRAL TRUST CAPITAL BANK, KATHERINE W. HULL, AND MARGARET HULL DANIELS, EXECUTORS, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 87887. Filed July 27, 1962.

---

[10] See sec. 1016(a)(5).

*Robert R. Batt, Esq.*, for the petitioner.
*Stephen P. Cadden, Esq.*, for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in estate tax against petitioner (Estate of Arthur H. Hull) in the amount of $56,937.32. The issues remaining for decision are:

(1) Whether Arthur H. Hull's gross estate for Federal estate tax purposes should be increased by the value of his estate's right to receive a share of partnership income subsequent to his death; and, if so

(2) Whether respondent correctly determined the value of this right at the alternate valuation date;

(3) Whether Arthur H. Hull's transfer of 15 life insurance policies within 3 years of his death was made "in contemplation of death"; and

(4) If these policies were transferred in contemplation of death, whether respondent's determination of the amount includible in Arthur H. Hull's gross estate by virtue thereof is correct.

### FINDINGS OF FACT.

Arthur H. Hull, hereafter referred to as decedent, was born on May 3, 1884, and died testate on February 2, 1957, while a resident of Harrisburg, Pennsylvania. Decedent's Federal estate tax return was filed with the district director of internal revenue, Philadelphia, Pennsylvania.

Decedent was survived by his wife, Katherine W. Hull, and by three daughters by a former marriage, Margaret Hull Daniels, Helen Hull Rainey, and Elizabeth Hull Bullock, hereafter sometimes referred to as Margaret, Helen, and Elizabeth, respectively. Decedent's wife,

his daughter Margaret, and the Central Trust Capital Bank are the duly qualified executors of his estate. Petitioner timely elected to have decedent's gross estate valued as of a date subsequent to his death, pursuant to the provisions of section 2032 of the Internal Revenue Code of 1954.[1]

At the time of his death, decedent was the senior partner of Hull, Leiby and Metzger, hereafter referred to as the partnership, a law partnership located in Harrisburg, Pennsylvania. The partnership agreement in effect at the time of decedent's death was dated May 5, 1954, and provided for the continuance of the partnership for 3 years, commencing January 1, 1955, and thereafter until terminated by mutual consent of the partners, or by 6 months' prior notice of withdrawal given by a withdrawing partner. Paragraph 7(c) of the agreement provided for the division of partnership net income (which, as used throughout herein, means net income after expenses and partners' salaries). Decedent's share was 18 percent for 1955, 17 percent for 1956, and 17 percent for 1957. Paragraph 8 of this agreement provided:

8. That in the event of the death of any one of the partners the partnership will pay to his estate, in full satisfaction of any claims such partner may have against the partnership, by reason of such partner's share in unpaid fees for services in connection with legal matters uncompleted before the death of such partner and not in payment of the purchase price of the deceased partner's interest, the amounts computed in the following manner: * * *

The amounts payable pursuant to this paragraph of the partnership agreement were not uniform as to all the partners. As applied to decedent, the payments called for under paragraph 8 and the dates on which such payments would have been required to be made were as follows:

*December 31, 1957.*—1. The value of his share of the library, lawbooks, equipment, and fixtures of the partnership.

2. The amount of salary (as prescribed elsewhere in the partnership agreement) earned by him for the month of January 1957.

3. One-twelfth of 17 percent of partnership net income for the year 1957.

4. Eleven-twelfths of 20 percent of 20 percent of partnership net income for the year 1957.

*December 31, 1958.*—20 percent of 20 percent of partnership net income for the year 1958.

*December 31, 1959.*—15 percent of 20 percent of partnership net income for the year 1959.

*December 31, 1960.*—10 percent of 20 percent of partnership net income for the year 1960.

---

[1] All section references are to the Internal Revenue Code of 1954, unless otherwise indicated.

Paragraph 9 of this agreement provided:

9. The making of the aforesaid payments to the estate of any deceased partner shall constitute full and complete discharge of any obligation, benefit, liability or claim which the deceased partner, his executor, administrator, or anyone claiming under him may have against the partnership, and the written statement of the senior partner setting forth the amount due to the partner or his estate shall be conclusive evidence of the correctness of such amount, and each partner does hereby waive any further or other accounting.

On December 31, 1956, decedent and the other members of the partnership executed an amendment to this agreement of partnership changing the percentage of partnership net income payable to the partners in the year 1956. Decedent's percentage for the year 1956 was reduced from 17 percent to 11⅘ percent.

Throughout the year 1956 there had been discussion among the partners concerning a change in the death benefits payable under the partnership agreement. In the course of these discussions, decedent and other partners pointed out that if several partners were to die during the same period the payments to their estates in accordance with the terms of the partnership agreement would embarrass the firm financially and no doubt would result in a number of the partners retiring from the firm. Sometime after December 31, 1956, but prior to decedent's death, a further amendment to the partnership agreement was prepared. This document, dated February 2, 1957, provided a new formula for determining the share of partnership net income payable to a deceased partner's estate. Under this new formula the estate of Arthur H. Hull would have been entitled to receive the following payments on the following dates (in addition to the value of decedent's interest in the library and other physical assets of the partnership, and the amount of his salary for the month of January 1957):

*December 31, 1957.*—1. One-twelfth of 11⅘ percent of partnership net income for the year 1957.

2. Eleven-twelfths of 15 percent of 11⅘ percent of partnership net income for the year 1957.

*December 31, 1958.*—1. One-twelfth of 15 percent of 11⅘ percent of partnership net income for 1958.

2. Eleven-twelfths of 7½ percent of 11⅘ percent of partnership net income for 1958.

*December 31, 1959.*—One-twelfth of 7½ percent of 11⅘ percent of partnership net income for 1959.

Decedent, who was not only the senior partner at the time of his death but was also the "strong man in the firm in making suggestions and controlling the policies of the firm and all its members," was a supporter of the plan to reduce partnership death benefits and he had personally defined and proposed the formula in this amendment. This

amendment was signed by all the partners (12) except decedent. Decedent, however, had discussed this amendment with one of the other partners and had assured him that he would sign it when it was prepared.

On March 15, 1957, the then senior partner, on behalf of the partnership, wrote a letter to decedent's wife, which he expressly indicated was for the information of decedent's three daughters as well, in which he traced the history of the May 5, 1954, partnership agreement and its amendments. In this letter he pointed out that the partnership agreement could be terminated by the mutual consent of the partners at any time after December 31, 1957, that the partnership lease on its present quarters terminated on the same date, that decedent had been in favor of reducing the partnership death benefits, and that all the partners felt that decedent would have signed the February 2, 1957, amendment had he lived. The letter continued:

Under the circumstances, our suggestion to you and the children is that you consider the suggestion that in his case we will not reduce the period to 24 months as we have in the case of all of the other partners, but that in return for our co-operation in this respect the applicable percentage of net income should be reduced to 11½%.

In other words, our suggestion is that the estate agree that for 11 months of the year 1957 the estate shall receive 20% of 11½% of the net income as calculated in the agreement, for the year 1958, 20% of 11½%, for the year 1959, 15% of 11½%, and for the year 1960, 10% of 11½%.

If this suggestion is agreeable, a new partnership agreement will be amended so as to include these provisions and the period extended for three years (until December 31, 1960). While we believe that Arthur would have joined in amending the partnership agreement to reduce the period to 24 months and to reduce the percentage to 15% for the first twelve months and 7½% for the second twelve months, and to reduce the applicable portion of net income to the figure actually received during lifetime, we all want to resolve the doubts in favor of the more generous agreement.

Before extending the partnership agreement for a new three-year period, and before renewing the lease, we want an opportunity to discuss this problem with all of you and I wrote this outline for your convenience.

On March 21, 1957, decedent's wife wrote to the partnership saying: "We all feel your agreement relative to Arthur's Estate is fair and generous, and we accept it and thank you for your kindness and consideration given us."

On July 6, 1957, the surviving partners of the partnership executed a new partnership agreement providing for the continuation of the partnership to December 31, 1960, or until thereafter terminated. Paragraph 9 of this agreement provided for payments to be made to decedent's estate on the dates and in the amounts as follows, consistent with the compromise agreement:

*December 31, 1957.*—1. $1,250 salary for January 1957.

2. $2,059.97 share in the library, etc.

3. One-twelfth of 11½ percent of partnership net income for 1957.

4. Eleven-twelfths of 20 percent of 11½ percent of partnership net income for 1957.

*December 31, 1958.*—20 percent of 11½ percent of partnership net income for 1958.

*December 31, 1959.*—15 percent of 11½ percent of partnership net income for 1959.

*December 31, 1960.*—10 percent of 11½ percent of partnership net income for 1960.

This agreement also incorporated all the other changes with respect to payments to a deceased partner's estate generally which had been incorporated in the amendment dated February 2, 1957.

On the dates set forth below, the partnership made the payments stated below (in addition to payments on account of salary and library not at issue in this proceeding) to petitioner, consistent with the compromise agreement:

| Date of payment, Dec. 31— | Nature of payment | Amount |
|---|---|---|
| 1957 | Share of partnership net income (after expenses and partners' salaries) for January 1957. | $4,255.17 |
| 1957 | Share of partnership net income (after expenses and partners' salaries) for balance of 1957. | 9,361.36 |
| 1958 | Share of partnership net income (after expenses and partners' salaries) for 1958. | 10,711.03 |
| 1959 | Share of partnership net income (after expenses and partners' salaries) for 1959. | 9,466.46 |
| 1960 | Share of partnership net income (after expenses and partners' salaries) for 1960. | 6,620.46 |
| Total | | 40,414.48 |

One of the surviving partners was a brother of decedent. None of the other surviving partners had any family relationship either to decedent or to decedent's widow or daughters.

At all times material the partnership depended for its earnings upon the rendering of legal services for numerous clients. At the time of decedent's death, the partnership was a well-established, highly reputable, and monetarily successful firm. The net income of the partnership (after expenses and partners' salaries) for each of the calendar years 1952–1960 was as follows:

| | | | |
|---|---|---|---|
| 1952 | $245,928 | 1957 | $444,017 |
| 1953 | 291,070 | 1958 | 465,697 |
| 1954 | 306,359 | 1959 | 548,780 |
| 1955 | 377,960 | 1960 | 575,692 |
| 1956 | 406,580 | | |

Petitioner in determining the value of decedent's gross estate for purposes of the Federal estate tax included therein only the amount of his partnership salary for the month of January 1957, the value of his share in the library, lawbooks, and fixtures of the partnership, and one-twelfth of 11½ percent of the partnership net income for the year 1957.

Respondent in his notice of deficiency dated April 11, 1960, determined that decedent's gross estate should be increased by the amount of $59,212.63, this amount being what respondent determined to be the fair market value on the alternate valuation date of petitioner's right to receive a share of partnership income subsequent to decedent's death ($63,467.80) less the amount of $4,255.17, which petitioner included in the gross estate as one-twelfth of 11½ percent of partnership net income for 1957. Respondent computed the value of $63,467.80 as follows:

| | |
|---|---|
| One-twelfth of 20 percent of partnership net income for 1957 ($444,796.84) | $7,413.28) |
| Eleven-twelfths of 20 percent of 20 percent of partnership net income for 1957 ($444,796.84) | 15,233.50 |
| Twenty percent of 20 percent of partnership net income for 1958 ($465,697.05) | 18,627.88 |
| Fifteen percent of 20 percent of partnership net income for 1959 (estimated at $465,697.05) discounted at 0.966184 | 13,498.47 |
| Ten percent of 20 percent of partnership net income for 1960 (estimated at $465,697.05) discounted at 0.933511 | 8,694.67 |
| Total | 63,467.80 |

On October 1, 1954, decedent irrevocably transferred in equal shares to his three daughters the ownership of 15 life insurance policies. The number, transferee, cash surrender value at date of transfer, and the cash surrender value at date of decedent's death of each policy and the proceeds of each policy received by transferee after decedent's death are as follows:

| Policy | Transferee | Cash value on Oct. 1, 1954 | Cash value on Feb. 2, 1957 | Proceeds |
|---|---|---|---|---|
| *Provident Mutual Life Ins. Co.—* | | | | |
| #558755 | Margaret Hull Daniels | $3,718.59 | $4,155.33 | $6,730.94 |
| 558755A | Elizabeth Hull Bullock | 3,718.59 | 4,155.33 | 6,730.94 |
| 558755B | Helen Hull Rainey | 3,718.03 | 4,154.70 | 6,729.92 |
| 746650 | Margaret Hull Daniels | 3,238.77 | 3,630.39 | 6,679.47 |
| 746650A | Elizabeth Hull Bullock | 3,238.77 | 3,630.39 | 6,679.47 |
| 746650B | Helen Hull Rainey | 3,238.28 | 3,629.84 | 6,678.47 |
| *Massachusetts Mutual Life Ins. Co.—* | | | | |
| #491718 | Margaret Hull Daniels | 3,094.60 | 3,310.60 | 5,053.30 |
| 491914 | Elizabeth Hull Bullock | 3,094.60 | 3,310.60 | 5,053.30 |
| 491858 | Helen Hull Rainey | 3,094.60 | 3,310.60 | 5,053.30 |
| *Penn Mutual Life Ins. Co.—* | | | | |
| #1977342 | Margaret Hull Daniels | 9,755.42 | 11,455.15 | 20,132.80 |
| 1977343 | Helen Hull Rainey | 9,755.42 | 11,455.15 | 20,132.80 |
| 1977344 | Elizabeth Hull Bullock | 9,755.42 | 11,455.15 | 20,132.80 |
| 1135501 | Margaret Hull Daniels | 4,539.05 | 4,643.58 | 5,045.29 |
| 1095725 | Helen Hull Rainey | 4,539.05 | 4,643.58 | 5,045.29 |
| 1095726 | Elizabeth Hull Bullock | 4,539.05 | 4,643.58 | 5,045.29 |
| | Total | 73,038.24 | 81,583.97 | 130,922.38 |

In his notice of deficiency, respondent determined that the fair market value of these policies at the date of decedent's death was $130,983.38 and he included this amount in decedent's gross estate

on the ground that the policies had been transferred in contemplation of death.

At the time of the transfers, decedent was 70 years of age. He was admitted to the Harrisburg Hospital on January 10, 1957, as a result of what his physician diagnosed as acute myocardial infarction. He followed a satisfactory course in the hospital and showed every evidence of healing, but on January 30, 1957, he suffered an attack of acute diverticulitis with perforation and generalized peritonitis, and his condition rapidly deteriorated until his death on February 2, 1957. This was the first serious illness decedent had ever had and it was the first time he had ever been hospitalized. Up until that time he had had no medical history of an acute nature beyond slight hypertension which was easily controlled by medication, and a "minimum amount of Paget's disease," which his physician deposed was nonfatal. Until the time of his last illness, decedent was an extremely active individual with his interests centering around his profession, his family, and his friends. He was primarily concerned with life and living and had never manifested any special concern about death or the disposition of his property thereafter to either his daughters, his physician, or his closest friend and law partner with whom he ordinarily discussed most of his affairs. Decedent did not believe in setting up trusts inuring to the benefit of future generations. In sharing his property with his family he had always attempted to treat each of his daughters equally.

Decedent executed his last will and testament on December 12, 1950, immediately following his marriage to his second wife, his first wife having died in 1947. This will, after making some specific bequests of furniture and other tangible personal property, provided that the residue of his estate be held in trust for his wife for her life with remainder in equal shares to his three daughters. It further provided that in the event his wife chose not to take under the will, the portion of his estate which did not go to his wife would pass immediately in equal shares to his daughters. Nothing which would have provided immediate financial support was to pass to his three daughters under this will unless his wife elected not to take under it. In a codicil to this will dated October 10, 1955, decedent devised to Elizabeth a house in Camp Hill, Pennsylvania, which he had purchased for her use in 1955.

Elizabeth was divorced from her husband on March 17, 1954. As a result of the divorce settlement she had received the home in Oklahoma City, Oklahoma, in which she and her husband had lived prior to their divorce, $100 a month alimony, and $100 a month for the support of her three children. Her equity in the house was approximately $5,000 and her mortgage payments were approximately $125–$150 a month. The $200 a month she received from her former hus-

band for alimony and support of her children and the $100-per-month allowance she received from decedent were the only available sources of income that she had. The divorce and the financial insecurity resulting therefrom had left her emotionally upset.

In two letters written to Elizabeth in March 1954, decedent expressed concern about her financial and emotional instability and expressed a desire and an intent to personally assist her financially for the indefinite future. In his letters, he suggested that she sell her home in Oklahoma City and move to Harrisburg where he felt he would be able to provide her with a house and give her $300 a month for support. He further suggested that she consider seeking employment because: "I realize of course that I may not be as physically fit for many years as I am at present."

In March 1954, decedent commenced the practice of sending Elizabeth $300 a month. Prior to this time decedent had given each of his daughters an allowance of $100 a month. In October 1955, Elizabeth moved from Oklahoma City to the house in Camp Hill purchased for her use by decedent. Decedent had previously bought a home for each of his other two daughters.

Decedent did not mention the transfers of the insurance policies in any of the letters to Elizabeth that were introduced into evidence by petitioner in these proceedings. Elizabeth testified, however, that in discussing the transfer with decedent he had informed her that his purpose was to ease her mind and to provide her with financial security. He informed her that the transfers of the policies to her two sisters were in keeping with his policy of always treating his daughters equally. He indicated the same thing to Margaret and Helen, in discussing the transfers with them. Following the transfers, decedent placed the policies in a safe at his law office, and none of the policies were in the physical possession of the transferees until after decedent's death, although it was their understanding that they were to have the free use of them. From the time of the transfers to his death, decedent paid all the premiums necessary to keep the policies in effect.

Decedent filed a Federal gift tax return for the year 1954, in which he reported the gift of the 15 life insurance policies and the premium payments made thereon by him in that year.

The stipulated facts are incorporated herein by this reference.

ULTIMATE FINDING.

Petitioner's transfer of 15 life insurance policies to his three daughters on October 1, 1954, was made in contemplation of death.

OPINION.

The first issue before the Court is whether the value of petitioner's right to receive a share of partnership net income in the year of de-

cedent's death and for the next succeeding 3 years is includible in decedent's gross estate for purposes of Federal estate tax.

The partnership agreement in effect at the date of decedent's death provided:

8. That in the event of the death of any one of the partners the partnership will pay to his estate, in full satisfaction of any claims such partner may have against the partnership, by reason of such partner's share in unpaid fees for services in connection with legal matters uncompleted before the death of such partner and not in payment of the purchase price of the deceased partner's interest, the amounts computed in the following manner: * * *

Among the payments prescribed under this death provision were percentage shares of partnership net income in the year of death and in the next succeeding 3 years.

The partnership agreement further provided that the making of the aforesaid payments to the estate of any deceased partner should constitute full and complete discharge of any obligation or claim which the deceased partner or anyone claiming under him may have against the partnership.

The estate tax return filed in behalf of petitioner included in gross estate only the amount of $4,255.17 with respect to these payments, which was designated on the return to be one-twelfth of 11½ percent of the partnership net income for 1957. Respondent determined that decedent's gross estate should be increased by the amount of $59,212.63,[2] by virtue of the estate's right under the partnership agreement to receive a share of partnership income in the year of death and the next succeeding 3 years.

Ordinarily, the death of a partner dissolves a partnership and the surviving partners have a duty to wind up the partnership affairs, pay its debts, render an accounting, and pay over to the deceased partner's representative the value of decedent's interest in the partnership as of the time of his death. Pa. Stat. Ann. tit. 59, sec. 92 *et seq.* (1961); *Froess* v. *Froess*, 284 Pa. 369, 131 Atl. 276 (1925). See *McClennen* v. *Commissioner*, 131 F. 2d 165 (C.A. 1, 1942). Presumably to avoid the disruption to partnership business which is caused by a winding up and an accounting, the partnership agreement in the instant case provided that the partnership would make prescribed payments to a deceased partner's estate [3] and that these payments would be in full satisfaction of all claims the deceased partner or his representative had against the partnership. The decedent's right to have these payments made to his estate after his death was a contractual right substituted for his or his estate's right to an accounting of the partnership as of the date of his death and at his death this contractual right

---

[2] See Findings of Fact for computation of amount.

[3] The payments included payment for his interest in the physical assets, for his salary earned to date of death, and ostensibly for his interest in fees for work done on legal matters prior to his death which legal matters were uncompleted and the fees uncollected at the time of his death.

passed to the executors of his estate in whose hands it was a valuable chose in action. *In re Arbuckle's Estate*, 252 Pa. 161, 97 Atl. 186 (1916). The right that decedent had to have these payments made to his estate after his death was property in which he had an interest at the time of his death within the meaning of section 2033, and its value was includible in his gross estate. *Estate of Charles A. Riegelman*, 27 T.C. 833 (1957), affd. 253 F. 2d 315 (C.A. 2, 1958) ; *Estate of George R. Nutter*, 46 B.T.A. 35 (1942), affirmed sub nom. *McClennen* v. *Commissioner*, 131 F. 2d 165 (C.A. 1, 1942) ; *John F. Degener, Jr., et al., Executors*, 26 B.T.A. 185 (1932) ; *Winkle* v. *United States*, 160 F. Supp. 348 (W.D. Pa. 1958) ; *Duffield* v. *United States*, 136 F. Supp. 944 (E.D. Pa. 1955).

We do not agree with petitioner that such a conclusion is contrary to the Supreme Court's decision in *Bull* v. *United States*, 295 U.S. 247 (1935). Respondent does not seek here, as in *Bull*, to include in decedent's gross estate his estate's share of partnership profits and losses earned after his death while the estate was ostensibly a member of the partnership, but rather he seeks only to include a contractual substitute for the decedent's share of partnership fees earned but unpaid at the time of his death. In *Bull*, the Supreme Court expressly approved the inclusion in the gross estate of a decedent's share of partnership profits at the time of his death. There is no reason why what in effect is a substitute therefor should not be accorded similar treatment. The nature of the transaction is not changed because the amount of the substitute is determined by reference to the amount of partnership net income subsequent to the decedent's death. See *Estate of Charles A. Riegelman, supra;*[4] *Estate of George R. Nutter, supra; Willard C. Hill et al.*, 14 B.T.A. 572 (1928), affd. 38 F. 2d 165 (C.A. 1, 1930), certiorari denied 281 U.S. 761 (1930).[5]

---

[4] In *Estate of Charles A. Riegelman*, 27 T.C. 833 (1957), there was included in gross estate not only decedent's share of fees for work in progress at date of death but also a share of fees attributable to work commenced after decedent's death and completed within the prescribed period.

[5] It can be argued with reason that this conclusion also finds support in other provisions of the 1954 Code and the legislative history thereof. If the payments here involved were in fact for decedent's share of fees for work in progress at date of death they would appear to qualify as an item of gross income in respect of a decedent under section 691(a) of the Code and section 1.691(a)–1, Income Tax Regs., and thus includible in the gross income of the recipient. On the other hand, if the payments are considered payments in liquidation of the interest of a deceased partner under section 736(a) they would also be considered income in respect of a decedent under section 691 by virtue of section 753. Section 691 in turn provides, *inter alia*, that a person who includes in gross income, income in respect of a decedent may deduct for the same taxable year that portion of the estate tax imposed upon decedent's estate which is attributable to the inclusion in the decedent's estate of the value of the right to receive such payments. See sec. 691(a)(1)(A), (c)(1) (A) and (B). Inherent in these income tax provisions is the implication that the value of the estate's right to receive such payments is includible in the decedent's gross estate, see *Reigelman's Estate* v. *Commissioner*, 253 F. 2d 315 (C.A. 2, 1958) ; *United States* v. *Ellis*, 264 F. 2d 325 (C.A. 2, 1959) ; and that Congress intended such an implication is manifested by statements in the Senate Finance Committee report and the Conference Committee report on section 753. See S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 405 (1954) ; Conference Report, H. Rept. No. 2543, 83d Cong., 2d Sess., p. 66 (1954).

The next question is the value of this right. Petitioner elected to have the gross estate valued as of a date subsequent to decedent's death, pursuant to section 2032. Respondent determined that as of February 2, 1958, the alternate valuation date, the fair market value of this right was $63,467.80. He determined this value by applying the percentage share formula prescribed in the partnership agreement of May 5, 1954, to the actual net income of the firm in 1957 and 1958 and to a discounted estimate of the partnership net income for 1959 and 1960 using as a base the actual net income in 1958. Petitioner contends that respondent erred in computing the value of this right because he did not take into consideration the compromise agreement between the estate and the partnership to reduce the estate's share of partnership net income and the circumstances surrounding the agreement, and because in computing the value of the estate's right to share in partnership net income for 1958 to 1960 he used the actual net income for the year 1958. We agree with petitioner.

Petitioner's right under the partnership agreement of May 5, 1954, was dependent upon and geared to the existence and amount of partnership net income after decedent's death. The agreement had no express provision for continuing the partnership after decedent's death, but even assuming that such was implied in the death provisions, the fact remains that the partners could have terminated the partnership at any time after December 31, 1957, 11 months after decedent's death. All the partners except decedent executed an amendment to the partnership agreement on February 2, 1957, reducing the benefits paid to a deceased partner's estate. These factors were emphasized by the surviving senior partner in his letter to decedent's wife and daughters which contained in effect an offer by the surviving partners to execute a new partnership agreement having a specific provision for payments to decedent's estate and a term conterminous with the payments in consideration for the estate's agreement to accept a smaller share than prescribed in the May 5, 1954, agreement, but a larger share than was prescribed in the amendment of February 2, 1957. This offer was accepted by the wife and daughters and we are satisfied that it was an agreement entered into at arm's length between parties with clearly adverse interests. The wife and Margaret were two of the three executors of the estate and could bind the estate.[6] The partnership performed under the agreement and that performance was accepted by the estate. There is no reason to believe the terms of the compromise agreement were not conclusive between the parties.

We think respondent's failure to consider this compromise agreement and the circumstances surrounding it in determining the value to

---

[6] Pa. Stat. Ann. tit. 20, sec. 320.519 (1950); *Fesmyer* v. *Shannon*, 143 Pa. 201, 22 Atl. 898 (1891).

be included in decedent's gross estate with respect to this right was error, particularly where, as here, the agreement was concluded and partially performed prior to the critical alternate valuation date. Whether we consider the terms of the compromise agreement as binding for valuation purposes or as evidence to be taken into consideration in arriving at the value of the right, we arrive at the same result. Contrary to respondent's contention, we think there may have been some doubt, even as of the date of death, of petitioner's ability to force payment under the terms of the original agreement of 1954. And certainly in valuing the right to receive these payments as of February 2, 1958, at which time the agreement had been concluded and payment had been made in accordance therewith, it would be ignoring realities not to take the compromise agreement into consideration. *Helvering* v. *Safe Deposit Co.*, 316 U.S. 56 (1942). While *Lyeth* v. *Hoey*, 305 U.S. 188 (1938), and *In re Sage's Estate* v. *Commissioner*, 122 F. 2d 480 (C.A. 3, 1941), affirming 42 B.T.A. 1304 (1940), are not directly in point, we think the principles enunciated therein support this conclusion. We do not think this is a factor affecting value by mere lapse of time within the meaning of section 2032(a)(3).

We also feel that respondent's use of the actual partnership net income in 1958 in his computation of the value of petitioner's right to receive income was error. *Ithaca Trust Co.* v. *United States*, 279 U.S. 151 (1929); *Estate of Charles A. Brooks*, 27 T.C. 295 (1956), affd. 240 F. 2d 937 (C.A. 3, 1958). The use of actual partnership net income for 1957 would seem to be appropriate by virtue of petitioner's election to value decedent's gross estate as of the alternate valuation date, at which time the actual net income for 1957 was known. See sec. 2032(a)(2); *Estate of George R. Nutter, supra.* When an election is made to use the alternate valuation date, the task is to determine the value of the property interest transferred at the time of death, and which has not been disposed of in the meantime, as of a date 1 year subsequent to the date of death. Logically, all evidence of value known as of the latter date should be taken into consideration. But on February 2, 1958, the alternate valuation date, the actual partnership net income for 1958 was not known and could not be determined. Therefore the value of the right to receive a percentage of partnership net income for 1958 must be estimated on the basis of facts known on the alternate valuation date in the same manner as the value of the right to receive income in 1959 and 1960.

Petitioner argues that the value of this right should be determined by averaging the partnership net income for the 5 years preceding decedent's death. While we recognize that this is one method used to value business enterprises, and also recognize that the death of a well-known and respected senior partner of a law firm might tend to depress an estimate of future earnings of the partnership, we can see no

reason here, in the light of the facts of record known as of February 2, 1958, to estimate that the net partnership earnings for 1958, 1959, and 1960 would be any less than the net earnings for 1957. The partnership had a history of steadily increasing income and the income for a period of 1 year after decedent's death was greater than any preceding year, and there is no evidence to suggest that it might decline in subsequent years. In our opinion the actual net income of the partnership for the year 1957 should be used in determining the value of the right to receive income for each of the years 1957 to 1960, inclusive.

One more issue is raised on the question of valuation. Respondent discounted the value of the right to receive income for the years subsequent to the date of death only to the alternate valuation date. We agree with petitioner that it should be discounted to the date of death. The right came into existence as of the date of death. The discount is because of the delay in receiving the income and has no relationship to the alternate valuation date.

In summation, we conclude that petitioner's right to share in partnership income is includible in the gross estate, and that the value of this right should be determined under the compromise agreement using actual partnership net income for the year 1957 as the estimated partnership net income for all years involved, discounted from the end of the calendar year for which the payments were due back to the date of death. The dollar value of the right can be determined under Rule 50.

The second major issue involves respondent's determination that decedent's transfer of 15 life insurance policies to his daughters on October 1, 1954, within 3 years of his death, was made in contemplation of death. Respondent included what he determined to be the fair market value of these policies at the date of death in decedent's gross estate pursuant to section 2035.[7]

The principles to be followed in determining whether the gifts here involved were made in contemplation of death are set forth in *United States* v. *Wells*, 283 U.S. 102 (1931). The following excerpts from that opinion provide the guideposts upon which the determination of this issue turns:

---

[7] SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property * * * to the extent of any interest therein of which the decedent has at any time made a transfer * * * in contemplation of his death.

(b) APPLICATION OF GENERAL RULE.—If the decedent within a period of 3 years ending with the date of his death * * * transferred an interest in property * * * such transfer * * * shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section * * *

[It is well established that the specific provisions for the inclusion of insurance policy proceeds in gross estate prescribed in section 2042 do not preclude the inclusion of the value of insurance policies in a decedent's gross estate under other sections of the Federal estate tax statutes. *May Billings et al., Executors,* 35 B.T.A. 1147 (1937) ; sec. 20.2042–1(a)–2, Estate Tax Regs.]

The dominant purpose is to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax. [Cits. omitted.] * * * The question, necessarily, is as to the state of mind of the donor.

* * * The words "in contemplation of death" mean that the thought of death is the impelling cause of the transfer, * * *

If it is the thought of death, as a controlling motive prompting the disposition of property, that affords the test, it follows that the statute does not embrace gifts *inter vivos* which spring from a different motive. * * *

\* \* \* \* \* \* \*

* * * It is sufficient if contemplation of death be the inducing cause of the transfer whether or not death is believed to be near. * * *

Petitioner contends that the facts surrounding the transfers establish that decedent's motive for them was associated with life rather than death and that the value of the policies is not includible in his gross estate pursuant to section 2035. His living motive, it claims, was the desire to give an emotional boost to his daughter, Elizabeth, whose recent divorce had left her financially and emotionally insecure. Petitioner contends that even if decedent intended the emotional boost to result from an awareness that she would receive the proceeds of the policies at his death, his dominant concern was her present state of mind, and that therefore the transfers were associated or dominated by a living motive. It further contends that decedent had a living motive for the transfers to Elizabeth's two sisters, namely to carry out his long-established policy of treating each of his daughters equally.[8]

Petitioner has the burden of overcoming not only the presumption of correctness attaching to respondent's determination but also the rebuttable presumption of section 2035(b) that transfers made within 3 years of death will, unless shown to the contrary, be deemed to have been made in contemplation of death. *Estate of Fletcher E. Awrey*, 5 T.C. 222 (1945). We are not satisfied that petitioner has overcome these burdens in this case. We have carefully reviewed the record in these proceedings and while we recognize that one of the factors that may have led to the transfers was decedent's concern for the financial and emotional security of Elizabeth, we are not convinced that his predominant motive for the transfers was one associated with life rather than one of the sort that leads to testamentary disposition. Decedent's words and deeds before and after the transfers indicate that it was his intention to personally provide Elizabeth with whatever financial assistance she needed during his lifetime. This, the fact that decedent continued to control the physical evidences of the policies and to pay the necessary premiums on them until he died, and the fact that none of the donees made any effort to use the policies before decedent's death, suggests that decedent did not intend that either

[8] See *Estate of Fletcher E. Awrey*, 5 T.C. 222 (1945); *Estate of William F. Hofford*, 4 T.C. 542 (1945).

Elizabeth or her sisters benefit from these policies until his death [9] but rather suggests that his purpose was to insure that Elizabeth would have a source of immediate financial assistance after his death when he could no longer personally help her. See *Estate of James E. Frizzell*, 9 T.C. 979 (1947), affirmed sub nom. *Burns* v. *Commissioner*, 177 F. 2d 739 (C.A. 5, 1949); *Davidson's Estate* v. *Commissioner*, 158 F. 2d 239 (C.A. 10, 1946), affirming a Memorandum Opinion of this Court. That such might well have been his motive for the transfers is further substantiated by the inherent testamentary nature of the subject of the transfers,[10] by the fact that in discussing the transfers with Elizabeth he had informed her of their approximate value in dollars after his death but not their value in dollars while he lived, and the fact that nothing passed to her in his last will and testament— unless his wife elected not to take under the will—which would have provided her with immediate financial support after his death.

In reaching this conclusion careful consideration has been given to all the facts in this case, including the decedent's good health and his apparent lack of any special concern over death during the period surrounding the transfers. As it was pointed out in *United States* v. *Wells, supra*, fear of imminent death is not a necessary element to a transfer in "contemplation of death" as that phrase is used in the estate tax statutes.

Petitioner, as we have pointed out, had the burden of overcoming not only the presumption of correctness attaching to respondent's determination but also the rebuttable presumption of section 2035(b). We have found that the evidence in this case suggests two plausible motives for decedent's transfer of the 15 life insurance policies in question: One being associated with life, and the other being of the sort that would lead to a testamentary disposition. The burden was upon petitioner to show that the living motive was the predominant one, and its failure to do so requires that respondent's determination be sustained. See *First Trust & Deposit Co.* v. *Shaughnessy*, 134 F. 2d 940 (C.A. 2, 1943); *Farmers' Loan & Trust Co.* v. *Bowers*, 68 F. 2d 916 (C.A. 2, 1934); *Estate of George F. Hurd*, 9 T.C. 681 (1947).

As a result of his determination that decedent transferred the 15 insurance policies in contemplation of death, respondent added to decedent's gross estate the sum of $130,983.38 which he determined was the fair market value of these policies at the time of decedent's death. This sum exceeds by $60 the sum of the proceeds of these

---

[9] Compare *Estate of Paul Garrett*, 8 T.C. 492 (1947), affirmed in part 180 F. 2d 955 (C.A. 2, 1950); *Thomas* v. *Graham*, 158 F. 2d 561 (C.A. 5, 1946); *Estate of Frank A. Vanderlip*, 3 T.C. 358 (1944), affd. 155 F. 2d 152 (C.A. 2, 1946), certiorari denied 329 U.S. 728 (1946).

[10] *Estate of Paul Garrett, supra* (see language in opinions of both Tax Court and Court of Appeals). We recognize, however, that the testamentary nature of the property transferred does not necessarily mean that the motive actuating its transfer is also testamentary in nature. *Estate of Wilbur B. Ruthrauff*, 9 T.C. 418 (1947).

policies that were received by decedent's daughters. Petitioner contends that the only interest decedent had, and therefore could transfer, in these policies was the right to their cash surrender value, and that only the fair market value of this interest, which it contends does not exceed $82,000, is includible in his gross estate as an interest in property transferred in contemplation of death. We do not agree with petitioner.

Petitioner correctly points out that the property involved is sought to be taxed under section 2035 of the Code, which requires inclusion in the gross estate of "the value of all property * * * to the extent of any interest therein of which the decedent has at any time made a transfer * * * in contemplation of his death," rather than under section 2042, which provides for inclusion in the gross estate of the value of all property "To the extent of the amount receivable by the executor [or other beneficiaries, with certain limitations] as insurance under policies on the life of the decedent." So our problem is to determine the value of the interest in these insurance policies which decedent transferred in 1954.[11] Petitioner agrees on brief that the value of the interest transferred is its value at the time of decedent's death for estate tax purposes. See *Liebmann* v. *Hassett*, 148 F. 2d 247 (C.A. 1, 1945) ; *Estate of Frank A. Vanderlip*, 3 T.C. 358 (1944), affd. 155 F. 2d 152 (C.A. 2, 1946), certiorari denied 329 U.S. 728 (1946); *Igleheart* v. *Commissioner*, 77 F. 2d 704 (C.A. 5, 1935), affirming 28 B.T.A. 888 (1933).

Petitioner's contention that the only interest petitioner had in these policies was their cash surrender value is based squarely on *United States* v. *Bess*, 357 U.S. 51 (1958), wherein the Supreme Court held that the Government's lien for unpaid taxes of a deceased insured attached only to the cash surrender value just prior to death of an insurance policy on his life rather than to the full proceeds of the policy in the hands of the beneficiary. Section 3670, I.R.C. 1939, provided for a lien in favor of the United States on all property and rights to property belonging to the delinquent taxpayer, and the Supreme Court reasoned that because the insured never could enjoy the proceeds of the policy he had no property or rights to property in the proceeds to which the lien could attach—but that insured did have property rights in the cash surrender value prior to his death to which the lien would attach.

After making a careful analysis of the *Bess* case, we do not think it requires or necessarily supports the conclusion sought by petitioner. The underlying theory of the *Bess* case is that the lien attaches only to that which the insured could realize or enjoy prior to his death. But

---

[11] While it is not entirely clear from the evidence presented, we assume from the evidence we do have and from the lack of evidence and arguments to the contrary, that decedent owned all incidents of ownership in these policies prior to the transfer.

here we are concerned with the value at the instant of his death of the interest of the decedent in the policies transferred. See *United States v. Land*, 303 F. 2d 170 (C.A. 5, 1962). Decedent transferred all the incidents of ownership and all the rights under these policies, and not just the benefits he could obtain and enjoy while living. This bundle of rights included not only the right to surrender the policies for their cash surrender value and to borrow against them, but also the right to change beneficiaries and the right to rely on the insurer's promise to pay the full face value of the policies on the death of the insured. *Guggenheim* v. *Rasquin*, 312 U.S. 254 (1941); *Estate of James Stuart Pritchard*, 4 T.C. 204 (1944). The value of these rights is not limited to the interest in property to which a lien would attach prior to insured's death. As pointed out by the Court in the *Bess* case, upon the death of an insured "in economic reality the insurer pays the beneficiary the insured's 'fund,' plus another amount sufficient to perform the insurer's promise to pay the proceeds on the insured's death."

It was said in *United States* v. *Land, supra:*

\* \* \* value looks ahead. To find the fair market value of a property interest at the decedent's death we put ourselves in the position of a potential purchaser of the interest at that time. \* \* \* A potential buyer focuses on the value the property has in the present or will have in the future. \* \* \*

We do not think it can be gainsaid that a potential purchaser, at the instant of decedent's death, of the interests in these policies transferred by decedent in 1954 would not limit the price he would pay therefor to the cash surrender value of the policies, knowing full well that as of that instant decedent could not change the beneficiaries and the beneficiaries then held a ripened claim for the full face value.

*Liebmann* v. *Hassett, supra*, insofar as it is concerned with Policy E as designated in the opinion, appears to be on all fours with the issue we have here and specifically concludes that the full face value (less a portion not pertinent here) of an insurance policy on decedent's life transferred by decedent in contemplation of death was includible in decedent's gross estate, rather than the cash surrender value as claimed by the taxpayer. Petitioner attempts to distinguish that case on the ground that the point raised by petitioner here does not appear to have been advanced in *Liebmann*. While we recognize that in *Liebmann* the taxpayer was contending for the cash surrender value as of the date of transfer, rather than the date of death, nevertheless the court appears to have considered carefully the difference in the two statutory provisions mentioned above and concluded that the value of the interest transferred in contemplation of death was the value of all the rights under the policy, including the right to receive the death proceeds, and was not limited to the cash surrender value.

Our conclusion here is also in accord with *Estate of Frank A. Vanderlip, supra; Igleheart* v. *Commissioner, supra;* as well as other cases involving transfers of life insurance policies in contemplation of death wherein there seems to have been no question that if the transfers were made in contemplation of death, the proceeds of the policies would be included in the gross estate. See *Estate of George F. Hurd, supra; First Trust & Deposit Co.* v. *Shaughnessy, supra; Estate of James Stuart Pritchard, supra.*

The value of these policies determined by respondent was $60 more than the stipulated proceeds of the policies. We cannot tell from the record how respondent arrived at fair market value. However, in view of the lack of evidence that the fair market value was less than the amount determined by respondent, we will sustain respondent's determination unless the parties can agree on the fair market value at the date of death, in the light of our conclusions set forth above, under Rule 50.

*Decision will be entered under Rule 50.*